Yes, may it please the court, my name is Gary Scalabrini and I'm appearing today on behalf of Arrow Electronics, the appellant and the defendant in the underlying action. Someone once told me that in litigation, especially trial, that you should always be prepared for everything. And if there is one case that has demonstrated that, it is this case. From Mr. Martin's direct testimony in which he revealed for the first time that he accepted $150,000 in kickbacks. You know, I saw that and you've been pretty active post hearing. I look at the opening statement and it says, so there aren't these, you know, the this plethora of doctor's appointments that should have interfered with his work. There was nothing going on that was interfering with his work, except perhaps the fact that he had a side business going on. He was selling while he was working for Arrow. You will hear from Dr. Adario say this. He was selling flash memory units on the side and Arrow sells those products. So he was competing with Arrow. And he must have been doing really well at it because he told Dr. Adario in one of his sessions that he had built up, in his words, a substantial cash reserve. I wonder how he did that. How did he build up a cash reserve if he wasn't selling at some kind of profit? That's my interlineation. He had money built up on the side from selling products that he sold for Arrow, but he did it on his own. He's got his own side business going on. Now, that's what you told the jury at opening statement. Not me personally. Well, your client. OK. You came up and you said start off by saying, you know, be prepared for anything. So you're representing the client. So you the client. And then, as I understand it, you backed off. Your client backed off and then professed surprised that when he got on the stand, he admitted that he was making money on it. I don't understand, quite frankly, why the district court in this case allowed you to amend your pretrial order. Because there's a big distinction for actually for a number of reasons. There's a big distinction between what was set forth in Dr. Adario's notes. And that's where it came from. I'm sorry, counsel. When I tried cases and made opening statements to the jury, I had done discovery on something that I knew about. What discovery did you all do to establish what came out or anticipate what might come out on the witness stand? As set forth in the briefs in this matter, we directly asked Mr. Martin what he was doing. And especially we went to exactly that testimony. Because, again, remember it came from Dr. When, in discovery? Yes, during the deposition. We asked him what that notation from Dr. Salter meant, which it was somewhat cryptic. It said, I'm trying to remember verbatim, but discussed legal and dollar sign issues. Mr. Martin testified in deposition he had no idea what that meant. He didn't. It wasn't his notes. He didn't know what it meant. Unknown to us what he had testified to, and this was really learned this after the deposition had closed out, that he had told Mr. Adario that he had some sort of side business going on, which he made money on. And that's what this had to deal with. Now, Mr. Martin at trial testified, if you look at the trial testimony, however, that he never had a side business. In fact, to this day, he'll deny that he had a side business. Well, that may be, counsel, but all of this is supposedly after acquired evidence. Right. And you'll have a little trouble with after acquired evidence where you had enough evidence, your counsel predecessor had enough evidence to go to the jury in his opening statement. Opening statement previewing the proof that you plan to put on. I don't see any of the qualifications that you're giving us here. What you're saying what was argued to the jury at the outset was that he made a substantial amount of money, and you had the proof to show it. Now, what you're saying is the only proof counsel was referring to was the cryptic note. That's one thing. Or you're now telling us that there was post-close of discovery, and yet you were still prepared to go in with the evidence that you'd acquired post-close of discovery. I see that. I just have trouble understanding the shock and awe and surprise that suddenly you find out on the witness stand that he confirms what you advertised to the jury you were going to prove in any event, and somehow that he made money on it. No, there's a distinction, again, to what I think we believed or what the client believed, Arrow believed at that time of opening statement, and then what came out in direct examination. There was a number of aspects of, quote, unquote, side businesses that Mr. Martin was engaged in. And one of the theories that was being put forward there in opening statement was he was not performing his job. He was distracted from performing his job due to these, quote, unquote, side businesses. Now, what evidence. Go ahead. What evidence were you going to put on to prove that he had this huge sum of money that he was earning on the side? I don't think the money, the huge amount of money. No, this is, I'm asking you, what was your proof? What witnesses were you going to put on? The witnesses would have been Dr. Dario. And did you call him? And asking him what he had, what he meant by those notes. And did you call him? We did call him. And what he stated as to that, quite frankly, I just, I cannot remember. Well, that's interesting. I don't remember what he said. Yes. Counsel, now maybe I'll just muddy this a little further. But my understanding was that there's like a difference possibly between him having a business on the side, which might have been consistent with company policy if it didn't interfere with his duties on the one hand. And on the other hand, taking a kickback, taking a payment from the customer, not for the goods that were bought, but a kickback, meaning like he sells the goods to the customer and then they give him a kickback payment. I thought that was the point of your after acquired evidence. That's exactly right. And that was the point I was just about to make before I answered your question, Justice Fletcher. And that is, what came out at trial was not that he had a side business selling flash memory products and query whether or not that would be a violation of errors policy. Quite frankly, it may be. But that wasn't what was litigated. What was litigated and what came out in trial, certainly struck us as surprise, was the fact that he what he testified to was he was misdirecting product in violation of errors policy. Arrow was selling that product to a broker, which violated errors policy. He said that himself. And in return for that, this customer, Arrow's customer, paid him $150,000 in what the district court ultimately concluded was kickbacks. Counsel, I don't. Judge Gould is absolutely right. And there's no doubt that you want to use it for demonstrating a reason now to terminate him. What I don't understand is how counsel could stand up in front of the jury with that kind of testimony and then say, even though we had all this opportunity for discovery, we didn't bother to go take his deposition or find out where the money came from or what it was and uncover this kickback scheme right at the outset of trial. I just find that hard to understand. And I wasn't I'm not the district judge, obviously, and wasn't there. But this is not as if you were blindsided with the notion that this guy had a business on the side and you couldn't have gone out and discovery and found out ahead of time. Your Honor, I guess what I'm trying to get at is we did in fact try to get at that during discovery. And specifically, we have him stating in the records. Essentially, this is in the brief. The third third crossbreed brief at page twenty seven in the records. Delta. So the following entry records of Dr. Salter, the following entry was made, quote, anxiety, getting worse. Meds only helping a little. Ready to talk to Danielle. Doesn't feel like he has a choice. Explored all legal and dollar sign issues. When he was asked about it, says, do you see where it says ready to talk to Danielle? Uh huh. And you, quote, explored all legal. And there is a dollar sign. I presume it means money issues. Do you see that? Yes. You know what she's talking about. No, I have no recollection of that. You see where it says in the next paragraph, I'm going to read it then. Acknowledge responsibility. Be sorry for it and move on. Do you know what the doctor is referring to there? No, I do not know. This is after he had his session with Dr. Dara, which at that time we didn't have those notes from Dr. Darrow. I believe that's correct. Where prior to his deposition, he stated that this is Dr. Darrow stating it, quote, then I advise Mr. Martin that Dr. Salter had made a note, has explored all legal and financial issues. They need to be upset. Whereupon he had lots of little income generators going on, And then he goes on to describe two side businesses, one refinancing mortgages and one this electronic flash component side business. Again, not misdirecting Arrow's product and taking a kickback from one of its customers. So we tried to do that. And I think the frustration is, in fact, one of the purposes for our request for continuance in this matter, which I would like to renew today, is this sort of, for lack of better word, moving target on testimony. Because now what we have the plaintiff stating is that he can't remember at all. When we ask him about the veracity of certain statements, he says he can't remember his testimony at all. When we ask him then whether or not as he sits here today, whether or not that testimony is factually accurate from his recollection today, he tells us, yes, he wasn't fired because of any of this. Right. OK. So really, the issue is we now have the testimony that he, in fact, was getting a side kickback or whatever you want to call it. So the question then turns on, what do we do with that in terms of the remedy? Is that right? Right. So why do we need a continuance? Why do we need all this nonsense? Well, with respect to the remedy, that's different than the issue of the after acquired evidence doctrine, because what his testimony now has raised in this new action is whether either his, the miscibility of his testimony or his, I'm drawing a blank on the word all of a sudden, his capacity to testify as to all the issues, because he didn't limit it just to these things, these minimal things. He testified at trial that the medication didn't affect him at all. Now he's saying that the medication and the stress, in fact, did affect his ability to recollect and perceive events. That's something. We do not have any indication from the district court, as I understand it, that it would entertain a motion to modify the judgment. And I thought that when remands like this are requested, that there was some precedent that suggested a procedure by which a motion is made in the district court for it to indicate if any of this would make a difference to it. Am I right about that? You're absolutely right. One of the reasons we requested the alternative continuance is that we simply have not had the time to move the district court. But what case? What's the case? What is the case that sets out that procedure that I'm talking about? It's crazy. Oh, I can get you the actual radio. Yes. OK. But we can get the site. But let me put your continuance issue to the side because absolutely right now I'm not mostly interested in. Let me just ask you about the after acquired evidence doctrine. And I understand from Judge Fisher's questions that he's got some concern whether all this after quite evidence in light of discovery or maybe a different question. But my question just goes to the doctrine. Am I right that that doctrine has been applied in federal court employment cases, has never been adopted by the California Supreme Court. So although the district court applied it here and then gave a partial remedy based on a balancing that the California Supreme Court has never said that doctrine applies. And also the district court did not give a total bar. He just cut out like the future pay. And as I understand it, the California Supreme Court has never given any guidance as to how that kind of balance should be conducted. Which all leads me to wonder, why shouldn't we certify the after acquired evidence issues to the California Supreme Court? Asking it, one, does the doctrine apply in an employment case like this? And two, if it does apply, what is the standard to decide whether it totally bars recovery or whether it just bars some aspects of recovery? The case is neither. Yeah. Neither party asked us to certify this, but we you know, we can certify even absent requests from the parties. And I'm sort of uncomfortable with this doctrine not having any California Supreme Court guidance. My belief, all the cases we cited was California courts of appeal. You're right. None of them are from the Supreme Court. And I would agree with you that this is a case, and quite frankly, I had not thought of it myself previously. But I would say this is the type of case that should be certified, primarily as it deals not so much that they would apply the doctrine. I believe the California Supreme Court would, especially given the appellate court's decision. The big issue is how far does that go? Our contention that we put in the papers is CAMP provides a complete bar, and that would be appropriate in this case. But CAMP and the other cases I don't think articulate well enough how to apply that standard and certainly do not discuss what the California Supreme Court would do with that. So I think a certification to the California Supreme Court would very much be helpful, I think, with respect to the application of the doctrine. But we'd first have to ask it, does the doctrine apply at all? Wouldn't we? Even though the intermediate courts have said it does. Yes. If it's certified, we'd have to say, does California apply this doctrine in a case like this where a guy is terminated? Not for this reason, but the evidence surfaces later. And then second, if so, how do you apply the remedy issues as to how much of the damages are terminated? Yes, I would agree with that. I know that my time I'm I'm definitely going into more. Thank you. We'd love to discuss this more. But we have your brace. Believe me, we read the brace. Thank you. Good morning. Please support him. Sharon Arkin for Doug Martin. I'd like to address Justice Gould's question first on certification. I think that the California Supreme Court, because it it tracks the U.S. Supreme Court in terms of how it applies doctrines to the FEHA claims the same way the U.S. Supreme Court applies doctrines to ADA claims, that the Supreme Court would follow McKinnon and say that doctrine can apply, but it only affects remedies. I don't think certification is appropriate in this case, primarily because of the procedural issues, because of our assertion that the answer should never have been amended to begin with. I don't think we get to the merits of the after-requirements. Well, if we agree with you on that, we wouldn't get to certification. I agree with you. If it shouldn't have been amended, then we wouldn't get to that. But assuming that under the standard for amending a pleading to conform to the trial evidence or amending a pretrial order, that it was permissible for the court to let them plead that affirmative defense, then in that case, would you agree that certification would make sense? Actually, I don't like your assumption much. I'd rather not go there, but I don't think it's warranted, because there's no conflict in the California appellate-level cases. They're all consistent. CAMP is different. I mean, CAMP is consistent. It just applies the remedy question differently because of the specific circumstances there. So CAMP adopts the doctrine, applies the remedy differently than we think it should be applied in this case based on factual distinction. But there's no conflict in the California appellate courts. And I think based on the California Supreme Court's consistency with the U.S. Supreme Court and McKinnon, I believe this Court can properly determine that issue without certification and further delay of this case. This man was fired in 2002. He needs to have this resolved. So, frankly, from our perspective, certification isn't warranted, it isn't necessary, and it would be an even greater burden on this appellant or this party. And if you don't mind, I would like to address the procedural issue. And counsel quoted from deposition testimony of Mr. Martin, taken at the time when they knew they saw these notes from Salter. They asked him his interpretation of those notes, and he said, I have no idea. They never said, did you have a side business? How were you making money any way other than in your aero income? Were you doing something? They never explored direct questions with him. When they got Dr. Adario's report and saw that comment that they're now relying on, they didn't ask to continue the trial. They didn't ask to reopen discovery. They didn't go down that road to try and find out what that reference was, what it meant, what was going on. In addition to which, in our briefs, we cite at least three circumstances where aero personnel had knowledge of what he was doing, that he was selling aero product. They knew that. The company knew it before this litigation even started. So to come in halfway through trial when the case in chief is almost complete, there are time limitations, there's not much time left, and say, we want to amend our complaint to tell you about something we didn't know, when they clearly did know it, both the client and the attorneys, I believe was an abuse of discretion under Rule 15. Did they know there was a kickback? Because there could be lots of situations where employees of companies have a side business, but even a side business related to the primary business, where that would be different from getting a kickback from a customer of that side business. I understand. But what Mr. Martin testified to in the trial in this case is that he told his supervisor that he was brokering surplus aero inventory to Gary Heppe. Roya Caldwell, one of his Mr. Martin's colleagues, he didn't report to her, she didn't report to him, but she was a manager in the same office, complained to the vice president of the company that he was doing side deals with this guy. Did anybody say that Mr. Heppe, after buying this product, is writing a check as a kickback to him? I can't tell you that. To my thinking, that's a very different thing than just having a business with the guy. Well, I understand, but then weren't they obligated to do discovery on this before the middle of trial? That's the question. They had information that they never asked a question. I guess, in my mind, the legal framework, if we're talking about the Rule 16 standard, is whether it's like a manifest injustice to let them plead this. And if we're talking about the Rule 15B standard, then it's kind of a question whether the plaintiff consented to getting into that by testifying about it. Well, the plaintiff was put in a position where the statement was made an opening statement. They questioned Dr. Adario about that note, and he felt like he needed to come clean, if you want to use that terminology, to the jury and explain what was going on. The point is, even if they didn't understand all the ramifications, and in opening statement he said he was making money on it, so they knew that prior to trial, that he was making money on it. He said that in opening statement. Didn't they have an obligation during the discovery process, before we got into trial, to do discovery on that? What kind of discovery would have been possible on this issue? They could have deposed Gary Heppy. They could have asked Doug Martin direct questions. They never asked him. But they said they did. They asked him. No. And he denied even remembering anything about this. They asked him what his interpretation of Dr. Salter's notes was. It wasn't a note he wrote. It was a note his psychiatrist or psychologist wrote. And they asked him what it meant. And he said he didn't know. They never then. That's a little bit disingenuous. Well, but they never said, were you making money some other way? They never followed him, followed up with a direct question to him about anything along that line. And when they got Dr. Dario's report, which had a more extensive explanation or discussion of that issue, they didn't seek to do additional discovery. They didn't seek to continue the trial. They just ran with what little they knew and went to the jury and said, we're going to show we're going to prove that he had a side business and he made money from it. It was a side business and making money. Seems like a very different thing. I'm saying he's taking a kickback. I understand. I understand that. So what that means to me that what you have to do on your procedural issue is address this issue in terms, in terms of the rule 16 and the rule 15 standards that govern whether the court could permit it to be planned. I think that would be more helpful to me, at least, than just arguing that that the company already knew about this. Well, I think that is important in that analysis, because the manifest injustice occurred when Mr. Martin was put to issues of proof during his case in chief that he hadn't anticipated, because they had dropped the misconduct affirmative defense from their answer two weeks before trial. They dropped it in the pretrial conference order, and then they raised it again in opening statement. He has to deal with the issue in his case in chief, and he's under time constraints, the trial court, limited his time to present his case in chief. So now he's got to deal with this whole issue that was dropped from the pretrial conference order, and the manifest injustice comes not only from that, but the fact that they had the information necessary to do discovery on this issue before the pretrial conference order was signed, and they didn't do it. So to allow them to sit on their hands throughout the discovery and the litigation in this case, drop the affirmative defense from the pretrial conference order, then raise it in their opening statement, raise it in cross-examination with Dr. Dario. It's – they were still saying it was some kind of misconduct. They were saying he shouldn't have been doing that, even though they didn't – may or may not have known that he was actually getting money. We don't know that for sure. And then – and they did nothing. They sat on their hands and put the burden on him to deal with this issue by raising it. So I think the manifest injustice here is to Mr. Martin, because he's the one who was certainly suddenly put to dealing with this issue after they had indicated no intent to pursue it. So I think the – Would you say if there's a damage remedy that gives him future income, let's say, for, you know, a certain period of time, that you have to assume that the company would not have found out about the kickback and fired him so that he should get that pay – get a present value of that future income stream? Or, you know, is it unjust to the company? What was motivating the district court? And do we review that for – am I right? It's an abuse of discretion, a review of that decision? It is. But the problem is – And which standard applies? Rule 16, manifest injustice? Or is it Rule 15 that deals with issues tried by consent based on the testimony that's submitted? Let's see, I don't believe this was tried by consent. Again, because of the scenario I just ran down, they dropped misconduct as an affirmative defense before trial. So – and they – but then they raised it during trial, and he felt compelled to address it in his case-in-chief. And even though it is an abuse of discretion standard to permit, you know, whether or not amended pleading is permitted, and that discretion is normally very broadly allowed, in this context, in the midst of trial – and there was no trial by consent. He was forced to it by their actions and their conduct. So – and in terms of the remedy, even if you assume that after acquired evidence doctrine applied, in terms of the remedy, the evidence is that Arrow knew that he was engaging in brokering transactions on the side. So I believe that that put them on notice, and that he – and if we're going to get into the recent testimony, the recent testimony confirms that the supervisor, his supervisor – Mr. Martin's supervisor, I'm sorry, knew about it and knew that Doug was making money from it. So if you want to go down that road, which I don't think we should, but that Arrow did know about it, in fact. So they – they were on notice. They didn't – they knew he was doing it. They didn't fire him, so after acquired evidence doctrine shouldn't apply. I don't know if I'm going to have – because they're cross appeals, I don't know if I'm going to have any chance to rebuttal, or do you even not want to hear from me anymore? I think we – I think we have the issues before us. I'm not sure you're going to need it. Very good. Thank you. Yes, I just have a couple very quick points I'd like to make. One, I just want to be clear with respect to – she mentions that there was a drop of misconduct from the pre-conference order. It's important to realize that the misconduct that was set forth in the pre-conference order had nothing to do with side business, kickbacks, anything like that. There was an investigation done with respect to Mr. Martin by HR, which is referenced throughout the record, in which he was investigated as to the treatment of employees and some other issues. That's the misconduct that was being referred to. That ultimately was decided wouldn't affect the underlying claim as an affirmative defense. But wouldn't that eliminate any claim of misconduct? You say we're not going to be pressing misconduct in our trial. No, because, again, it wasn't – we weren't – you're right. We weren't going on pressing the misconduct because we didn't realize – Well, you were right in your opening statement. The misstatement, though, again, wasn't being offered to show misconduct. It was being offered to show that he wasn't performing his job duties as a general manager. What I think is interesting is it's easy to look back on this now and say, aha, this all makes sense. But we didn't know then what was going to come up. And the references made by counsel to my colleague, Jerry Griffin, during open statement, never expected to open up this issue. What's interesting to me is it did come up on direct, and that's why I think 15A applies. And it reminds me of the story they egged around with Ellen Poe with the beating heart. But he's the one who knew about it. He's the one who brought it up in direct testimony. He allowed it to go to jury so 15A would apply. The only quick issue I have remaining was this issue of the motion to remand. Again, we would like the opportunity to go back to the district court to see whether or not they would entertain a motion under 60B6. I think it's appropriate in this case. I think given his comments on what he could or could not recollect raises a lot of issues with respect to competency and admissibility. All right. Thank you. All right, counsel. Thank you. The case argued is submitted. The next case on calendar will be United States v. Morris.
judges: Fletcher B. , Fisher, Gould